UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TANISHA J. COULTER,

        Plaintiff,                         Civil Action No. 14-CV-10096

vs.                                           HON. MARK A. GOLDSMITH

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/

**OPINION AND ORDER (1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. 15), (2) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 17), and (3) REMANDING TO THE COMMISSIONER FOR FURTHER PROCEEDINGS**

**I.    INTRODUCTION**

       This is a social security case in which Plaintiff Tanisha J. Coulter appeals from the final determination of the Commissioner of Social Security, denying her application for disability benefits under the Social Security Act, 42 U.S.C. § 1381 et seq. Plaintiff protectively filed for social security on June 28, 2011, alleging disability beginning on September 1, 2007. Administrative Record ("A.R.") at 27 (Dkt. 10). Plaintiff's application was initially denied on November 1, 2011. Id. at 88. Plaintiff subsequently sought a hearing on her application, id. at 92, and a hearing was held before Administrative Law Judge ("ALJ") Andrew Sloss on June 7, 2012, id. at 42.

       At the hearing, Plaintiff claimed disability as a result of rheumatoid arthritis, scoliosis, and a social anxiety disorder. Id. at 44-45. The ALJ issued a decision finding that Plaintiff was not disabled since June 28, 2011, the date the application was filed. Id. at 34. Plaintiff requested review of this decision from the Appeals Council, id. at 20, and the Appeals Council denied this

1

request, id. at 12. At that point, the ALJ's decision became the final decision of the Commissioner. Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 543-544 (6th Cir. 2004). Plaintiff then filed a complaint in this Court to contest the ALJ's decision (Dkt. 1). The parties filed cross-motions for summary judgment (Dkts. 15, 17).[1]

For the reasons set forth more fully below, the Court grants Plaintiff's motion for summary judgment, denies Defendant's motion for summary judgment, and remands the case to the Commissioner for further proceedings.

## II. BACKGROUND

### A. Statements and Testimony

Plaintiff completed a disability function report on August 21, 2011. A.R. at 165-172. In that report, Plaintiff stated that she could not stand for long periods of time because of back and knee pain and that her fingers would "lock[] up." Id. at 165. Plaintiff further stated that her "lower back aches and stiffens" when she lies down. Id. Plaintiff also indicated that she becomes nervous around people, causing her to sweat and her hands to shake. Id. Plaintiff reported that she was able to cook, dress, and do laundry for herself and others, but that someone assists her in cleaning the house and performing outdoor work. Id. at 166, 167. Plaintiff claimed that she cannot go to crowded places alone, or at all, but that she does shop approximately twice a month. Id. at 168. Her daily hobbies include accompanying her children to the park, visiting relatives, watching TV, playing board games, talking on the phone, and reading. Id. at 169. She also regularly attends meetings at her children's school, but otherwise prefers not to go out in public or be around people. Id. at 169-170. Plaintiff wrote that her conditions affect her ability to lift, bend, stand, walk, sit, kneel, climb stairs, concentrate, and use her hands; she stated that

---

[1] Although this case was originally referred to Magistrate Judge Charles E. Binder, see Notice of Referral (Dkt. 5), the Court subsequently entered an Order withdrawing the reference to the Magistrate Judge. See Order Vacating Notice of Referral (Dkt. 18).

she could lift no more than 10 to 15 pounds and was unable to walk more than a block without having to rest. Id. at 170. She also stated that her pain medication impairs her ability to concentrate and that her mind wanders after 15 to 20 minutes. Id. However, Plaintiff wrote that she finishes what she starts and that she is capable of following written and spoken instructions. Id. Plaintiff also claimed that she does not handle stress well, but that she is able to manage changes in routine. Id. at 171. At the time of the function report, Plaintiff wore a back brace for long periods of sitting and had been prescribed Xanax. Id. at 171-172.

     A hearing on Plaintiff's disability application was held on June 7, 2012. Id. at 42. At the hearing, Plaintiff testified that she had a twelfth-grade education level and a certificate for a computer class from Baker College; at the time of the hearing she was employed as an inventory associate, working twice a week in four-hour shifts. Id. at 43-44. More hours were available but Plaintiff testified that she could not work additional hours due to her conditions. Id. at 44. She stated that her arthritis and scoliosis cause her back and joint pain, and that she is on prescribed pain medication. Id. at 44, 45. Her social anxiety disorder causes her to sweat, shake, and be nervous around large groups of people; Plaintiff testified that she was treating her anxiety with medication and therapy. Id. at 44-45.

     Plaintiff testified that she could sit for about 25 minutes and walk for about 15 minutes without pain; she could alternate sitting and walking/standing for about an hour, and then would need to take a pain pill. Id. at 46-47. Plaintiff indicated that her pain was always present and, on a scale of one to ten, was regularly a six or a seven. Id. at 48. She testified that the pain was exacerbated by walking or standing for long periods of time, and that she was most comfortable lying down; Plaintiff suggested that she would spend four to six hours a day lying down. Id. at 48-49. Plaintiff also testified that her arthritis impeded her ability to lift or grip items — she

often dropped things — but that she can perform finer movements. Id. at 49. Plaintiff stated that her arthritis also caused her knees to painfully lock up after 30 to 40 minutes of standing. Id. at 50. Upon completing a four-hour shift at her work, Plaintiff testified to feeling "tired" and "painful." Id. at 51-52. Plaintiff also stated that she was unable to keep up with the expected pace and would only complete about half of her work. Id. at 52. At work, Plaintiff did not require breaks in excess of the allotted 30-minute break. Id. at 53.

At the time of the hearing, Plaintiff was seeing a rheumatology specialist, who prescribed pain medication and monitored Plaintiff's condition. Id. at 50. Plaintiff testified that the pain medication "sometimes" helped to relieve her pain, but then noted that the pain medication worked when taken as prescribed. Id. at 55. Plaintiff estimated that the most she could lift without difficulty was 15 to 20 pounds. Id. at 56. Plaintiff also estimated that she would have two to three pain-free days a week, but on a bad day her "whole body ache[d]." Id. Plaintiff stated that, in the four months since she has been employed as an inventory associate, she has only had to call in once due to pain. Id. at 57.

Plaintiff also indicated that she suffers from panic attacks when in a group of four or more people. Id. at 50-51. She testified that at work there are almost 20 people assigned to a shift, but that she works by herself. Id. at 51. Plaintiff stated that she was unable to participate in her children's school activities because of her anxiety disorder, and that she had relatives take her children out to public places. Id. at 53-54. Plaintiff was prescribed Celexa for her anxiety disorder but did not find it effective; therapy, and other coping techniques, however, had occasionally been effective. Id. at 54-55.

### B. Medical Records

#### 1. Treating Sources

Medical records indicate that Plaintiff was diagnosed with dextroscoliosis in the lumbar region of her spine in 2005. A.R. at 225. At that time, there was no fracture or subluxation, Plaintiff's pedicles were symmetric, and her disk spaces were well-preserved. Id. Plaintiff was also diagnosed with levoscoliosis in the thoracic region of her spine, although her bone density was normal and her paraspinal lines were unremarkable. Id. In May 2009, Plaintiff underwent an Electromyography ("EMG") and Nerve Conduction Study after complaining of pain in her left hand lasting the prior three months. Id. at 202. Extensive needle EMG of Plaintiff's upper extremities demonstrated no signs of mononeuropathy, plexopathy, or radiculopathy. Id. at 203.

On July 2, 2009, Plaintiff saw Dr. Ali Karrar, M.D., for a consultation at the request of Dr. Julian Moore, M.D. Id. at 214-215. Plaintiff presented with joint pain, which was exacerbated by activity, stiffness, which was exacerbated by inactivity, and swelling, located mostly in her hand, wrist, and right knee. Id. at 214. Plaintiff characterized the pain as intermittent, sharp, and, on a scale of one to ten, rated it as an eight. Id. A physical exam revealed that Plaintiff was able to walk without assistance and had a normal and stable gait; her muscle tone and strength was observed to be normal, and there were no abnormalities associated with her back. Id. Plaintiff's wrists were tender and painful upon movement. Id. Potential diagnoses included rheumatoid arthritis and systemic lupus erythematosus; Plaintiff was tested for rheumatoid factor. Id. at 215. Plaintiff saw Dr. Karrar again on July 27, 2009 with the same complaints and a physical exam revealed similar findings; the test for rheumatoid factor had come back positive. Id. at 212-213. Dr. Karrar wrote that Plaintiff's rheumatoid arthritis was not active and that she was asymptomatic with no active synovitis on examination. Id. at 213. Plaintiff returned to Dr. Karrar in September 2009, characterizing her pain as constant, aching, and moderate. Id. at 248. Dr. Karrar found Plaintiff to be pleasant and in no apparent distress,

and noted similar findings as his previous exams, with the addition of pain upon movement in Plaintiff's shoulders. Id. The diagnosis remained rheumatoid arthritis and Plaintiff was prescribed Plaquenil. Id.

In April 2010, Plaintiff received a check-up, and complained of fatigue and that her knees "knock up." Id. at 230.[2] Over a year later, in June 2011, Plaintiff saw Dr. Jose Lopez, M.D., complaining of chest pain and intermittent joint pain and stiffness. Id. at 239. At the time, she denied experiencing anxiety or depression. Id. Upon examination, Plaintiff's lower extremities appeared normal. Id. at 240. She was prescribed Motrin. Id. In July, Plaintiff followed up with Dr. Lopez, complaining of an acute headache that occurred two to three times a week and was sudden in onset. Id. at 238. Plaintiff stated that the Motrin did not relieve the headaches, but also stated that the headaches did not limit her activities. Id. A physical exam revealed no abnormal findings. Id. at 238-239. On this visit, Plaintiff also complained of anxiety and depression. Id. at 238. Dr. Lopez prescribed Ambien. Id. at 239.

In September of 2011, Plaintiff saw Dr. Julian Moore, M.D., complaining of knee pain and a "popping sensation." Id. at 269.[3] In October, Plaintiff saw a radiologist for both her back and knee pain. Dr. Bhargavi Raiji, M.D., observed "marked dextroscoliosis of the lumbar spine," but noted that all other aspects of Plaintiff's back appeared normal and satisfactory. Id. at 279. Dr. Raiji also found no abnormalities associated with Plaintiff's knee. Id. at 280. Plaintiff continued to complain of knee pain. Id. at 268, 275-276 (knee tender with abnormal range of motion), 261 (pain was moderate and alleviated by ice compression and a knee brace), 262-263 (knee tender with pain on flexion; moderately limits activities). An MRI was ordered

---

[2] The medical record does not indicate who performed the check-up and the results, if any, of a physical exam.

[3] There appear to be no clinical observations associated with this visit.

6

and the results were consistent with a "mild grade I sprain." Id. at 270. In February of 2012, Plaintiff continued to report back pain, triggered by exertion; on examination the cervical region of her spine appeared tender. Id. at 259. She was diagnosed with fibromyalgia, anxiety, and depression. Id. Dr. Moore observed Plaintiff to be in acute distress, and noticed that she exhibited psychomotor slowing and agitation. Id. Plaintiff underwent another nerve study, but all muscle groups sampled appeared normal. Id. at 287-288.

In April 2012, Plaintiff was referred for a psychiatric evaluation, including medication. Id. at 317. Plaintiff reported that she had suffered from social anxiety for a number of years, but that her depression was a new symptom. Id. At the evaluation, Plaintiff's thought processes and content, memory, and orientation all appeared appropriate; she reported being easily distracted. Id. at 319. Plaintiff was diagnosed with major depressive disorder, single episode, and social anxiety disorder, and had a global assessment of functioning ("GAF") of 47-50. Id. At the time, Plaintiff was reported to be taking Celexa and Ambien. Id. at 320. Plaintiff commenced therapy, and in the course of her sessions she reported feeling overwhelmed, sad for no reason, and anxious. Id. at 298, 304, 312, 313, 317. She cited instances of being unable to enter a mall because of the crowds and dropping things because her hands tremble from anxiety. Id. at 312, 313. A mental status examination observed Plaintiff as quiet but responsive and cooperative; her memory appeared normal and her intellect was above average. Id. at 306. She also appeared severely anxious and mildly depressed. Id.

On June 6, 2012, Plaintiff's primary care physician, Dr. Moore, filled out a Residual Functional Capacity Questionnaire provided by Plaintiff's representatives before the Social Security Administration. Id. at 308-310. According to the questionnaire, Dr. Moore has been

7

treating Plaintiff since 2007 and characterized Plaintiff's prognosis as "poor." Id. at 308.[4] Dr. Moore indicated that Plaintiff's rheumatoid arthritis was severe enough to "frequently" interfere with her ability to perform simple work tasks. Id. Furthermore, Dr. Moore stated that Plaintiff's medications caused her to become drowsy and have an upset stomach. Id. Dr. Moore estimated that Plaintiff would need to take unscheduled breaks, lasting 10 to 15 minutes each, every 30 minutes. Id. Dr. Moore wrote that Plaintiff could only walk half a block before experiencing significant pain, could only sit for 15 to 20 minutes, and could only stand or walk for 15 to 20 minutes. Id. Further, Plaintiff could only sit for three to four hours and stand for one to two hours during an eight-hour day. Id. Dr. Moore restricted Plaintiff to lifting less than ten pounds on an occasional basis and also identified limitations in Plaintiff's ability to reach, handle, or finger objects. Id. at 309. The questionnaire also suggests that Plaintiff would miss work approximately three to four times a month because of her condition. Id. Ultimately, Dr. Moore concluded that Plaintiff was not physically capable of working an eight-hour day, five days a week. Id.

### 2. Non-Treating Sources

Plaintiff also underwent a psychiatric evaluation on October 26, 2011 with Karen Marshall, a licensed psychologist, as part of the state disability determination. A.R. at 243-246. The evaluation notes that Plaintiff appeared anxious and shy, but that she maintained consistent eye contact and was cooperative. Id. at 244. Ms. Marshall stated that Plaintiff was able to "understand, remember and complete simple repetitive tasks," but would "complete [multistep tasks] at a decrease[d] rate of pace if she's in a public environment as she will experience restlessness and [a] decrease in concentration due to her anxiety regarding social interactions."

---

[4] In a later portion of the questionnaire, Dr. Moore wrote that Plaintiff had been a patient since 2005, not 2007, and that Plaintiff has had her limitations and restrictions since 2007. A.R. at 310.

Id. at 245. Ms. Marshall further stated that "[s]ocial interactions will be [Plaintiff's] biggest challenge in the work environment," as "she will be withdrawn and hesitant to speak up." Id.

### C. Vocational Expert

Ms. Judith Findora, a vocational expert ("VE"), testified at the hearing. A.R. at 27. The ALJ posed the following hypothetical to Ms. Findora:

> I'd like you to assume a person of the claimant's age, education and who has no past relevant work, is able to perform light work as defined by the regulations. Her psychological symptoms limit her to unskilled work as defined by the regulations that has only occasional changes in the work setting and that involves only occasional interaction with the general public.

Id. at 58. Ms. Findora testified that there would be jobs, including "cleaners such as janitors and housekeepers numbering approximately 13,000," "stock clerks numbering approximately 7,000," "general office clerks numbering approximately 9,900," and "assemblers numbering approximately 19,500." Id. at 58-59.

The ALJ also inquired as to whether an individual who, due to a combination of medical conditions and psychological symptoms, was unable to engage in sustained work activity for eight hours a day, five days a week, or an equivalent work schedule would be precluded from all competitive work, regardless of exertional level. Id. at 59. Ms. Findora testified that such an individual would be precluded from work. Id. Ms. Findora also testified that Plaintiff's work as an inventory clerk would not fall within the ALJ's initial hypothetical. Id.

Plaintiff's attorney also inquired whether any of the jobs listed in response to the ALJ's hypothetical would accommodate a sit/stand option. Id. at 59-60. Ms. Findora responded that there would be approximately 5,500 office clerk positions, 4,500 assembler positions, and 1,000 stock handler positions. Id. at 60. In response to additional questions by Plaintiff's attorney, Ms. Findora also testified that no positions would be available for someone who needed an

unscheduled break every 30 minutes, or for someone who would be absent from work three to four times a month. Id.

### III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court's "review is limited to determining whether the Commissioner's decision 'is supported by substantial evidence and was made pursuant to proper legal standards.'" Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 512 (6th Cir. 2010) (quoting Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Lindsley v. Comm'r of Soc. Sec., 560 F.3d 601, 604 (6th Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). In determining whether substantial evidence exists, the Court may "look to any evidence in the record, regardless of whether it has been cited by [the ALJ]." Heston v. Comm'r of Soc. Sec., 245 F.3d 528, 535 (6th Cir. 2001). "[T]he claimant bears the burden of producing sufficient evidence to show the existence of a disability." Watters v. Comm'r of Soc. Sec., 530 F. App'x 419, 425 (6th Cir. 2013).

"Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether an individual is disabled, the Commissioner applies the following five-step sequential disability analysis: (i) whether the claimant performed substantial gainful activity during the disability period; (ii) whether the claimant has a severe medically determinable impairment; (iii) whether the claimant has an impairment that meets or equals a listed impairment; (iv) whether the claimant, in light of her residual functional capacity ("RFC") can return to her past relevant work; and (v) if not, whether

the claimant, in light of her RFC and her age, education, and work experience, can make an adjustment to other work. See 20 C.F.R. § 416.920(a) (explaining the five-step sequential evaluation process). Plaintiff has the burden of proof for the first four steps, but, at step five, the burden shifts to the Commissioner to show that "notwithstanding the claimant's impairment, [s]he retains the residual functional capacity to perform specific jobs existing in the national economy." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).

## IV.    THE ALJ'S DECISION

The ALJ based his decision on an application of the Commissioner's five-step sequential disability analysis to Plaintiff's claim. The ALJ found as follows:

- Under Step One, Plaintiff had not engaged in substantial gainful activity since June 28, 2011, the date of Plaintiff's application. A.R. at 29.

- Under Step Two, Plaintiff had the following severe impairments: "rheumatoid arthritis, scoliosis, a social anxiety disorder and an adjustment disorder with depressed mood." Id.

- Under Step Three, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Id.

- Under Step Four, Plaintiff had the RFC "to perform light work as defined in 20 CFR 416.967(b) . . . [but] is limited to unskilled work as defined by the [regulations], in work that has only occasional changes in the work setting and that involves only occasional interaction with the general public." Id. at 30. Plaintiff had no past relevant work. Id. at 33.

- Under Step Five, Plaintiff had the age, education, work experience, and RFC to perform the following jobs that exist in significant numbers in the national economy: cleaner (13,000 jobs), stock clerk (7,000 jobs), general office clerk (9,100 jobs), and assembler (19,500 jobs). Id. at 33-34.

## V.    ANALYSIS

In her motion for summary judgment, Plaintiff appears to take issue with the ALJ's determinations at both Step Four and Step Five, arguing not only that the ALJ failed to incorporate all of Plaintiff's limitations into the RFC, but that, similarly, the ALJ also failed to

craft an accurate hypothetical that captured all of Plaintiff's limitations, thus precluding the ALJ from relying on the VE's testimony as substantial evidence at Step Five. Plaintiff also presses an additional argument that the ALJ failed to properly weigh the opinion of Dr. Moore, Plaintiff's treating physician. Because the weight afforded to Dr. Moore's treating-source opinion bears directly on whether the ALJ reached an appropriate RFC determination, the Court addresses Plaintiff's latter argument first.

Ultimately, the Court concludes that the ALJ summarily dismissed Dr. Moore's opinion without adhering to the procedural requirements of the treating-physician rule. As such, the ALJ's determination is not supported by substantial evidence. Similarly, to the extent that the ALJ's RFC is predicated on the ALJ's rejection of Dr. Moore's opinion, the RFC, too, is flawed. Accordingly, remand to the Commissioner is warranted.

### A. The ALJ Failed to Comply with the Treating-Physician Rule

The treating-physician rule provides for the amount of deference a decision-maker must give to the opinions of the claimant's treating physician. Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 406 (6th Cir. 2009) (ALJ must "generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians."). The regulations define medical opinions as, "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite [the] impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). The treating source's opinion must be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(c)(2).

If the ALJ does not give the treating physician's opinion controlling weight, the ALJ must (i) determine how much weight to assign to the opinion, and (ii) support its determination of how much weight to give with "good reasons." See Friend v. Comm'r of Soc. Sec., 375 F. App'x 543, 550 (6th Cir. 2010); Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 875 (6th Cir. 2007). In doing so, the ALJ must consider certain relevant factors, as listed in the regulations. See 20 C.F.R. § 404.1527(c)(2) (outlining factors to be applied in the event a treating physician's opinion is not given controlling weight). The ALJ's reasons must be "'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" Rogers, 486 F.3d at 242 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5). A failure to sufficiently identify those reasons or how those reasons affected the ALJ's consideration of the treating-source opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." Id. at 243.

Plaintiff argues that the opinion of Dr. Moore — Plaintiff's treating physician — should be deemed controlling. Pl. Mot. at 15 (Dkt. 15). In support of her argument, Plaintiff merely states that the "medical evidence supports Dr. Moore's findings," and then simply repeats the recitation of Plaintiff's medical history contained in an earlier section of Plaintiff's brief. Id. at 15-16; compare id. at 2-3.[5]

---

[5] Plaintiff's argument on this point also contains a reference to the ALJ's agreement with the objective findings of a "Dr. Jamieson." Pl. Mot. at 15. However, the record appears to contain no findings, objective or otherwise, attributable to a Dr. Jamieson, and the ALJ's decision makes no reference to such findings. Thus, the Court is left to conclude that this reference was included by Plaintiff's counsel in error.

In response, Defendant argues that the ALJ properly discounted Dr. Moore's opinion because the opinion was not supported by the medical evidence of record. Def. Mot. at 9 (Dkt. 17). Specifically, Defendant argues that Plaintiff's "conservative course of treatment" and Plaintiff's own reported abilities are inconsistent with Dr. Moore's opinion. Id. at 10. Defendant further argues that "Dr. Moore did not include arthritis as an active diagnosis during any of" Plaintiff's appointments, id., presumably inferring that Dr. Moore did not consider Plaintiff's rheumatoid arthritis to be of significant issue during the relevant time periods.

The ALJ found Dr. Moore's statement that Plaintiff was totally disabled "not corroborated by the evidence of record including her own treatment notes." A.R. at 33.[6] Specifically, the ALJ noted that the "record shows only transient pain with relatively mild symptomotology [sic]" and that Plaintiff "does not require surgery and she has never been to a pain clinic." Id. There is no additional analysis or discussion with respect to Dr. Moore's opinion, and the Court finds the provided analysis insufficient to constitute substantial evidence.

It is true, as Defendant argues, that treating-source physician opinions "receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence." Bogle v. Sullivan, 998 F.2d 342, 347-348 (6th Cir. 1993); see also Blakley, 581 F.3d at 406 ("'[I]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent [] with other substantial evidence in the case record.'" (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2)). Nonetheless, where the ALJ does not assign a treating physician's opinion controlling weight, "the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the

---

[6] By "her treatment notes," it is unclear whether the ALJ is referring to Dr. Moore's own treatment notes or Plaintiff's medical records as a whole.

treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." Id. at 406.

Here, the ALJ failed to explain how much weight, if any, he gave to Dr. Moore's opinion, and did not consider any of the factors discussed above, or outlined in 20 C.F.R. § 404.1527(c)(2). Even assuming that Dr. Moore's opinion was properly discredited, the ALJ is still bound by the Commissioner's procedural requirements to adequately explain the amount of weight afforded to the opinion. Blakley, 581 F.3d at 408. Even when the opinion is not supported by other substantial evidence in the record, it does not necessarily follow that the opinion should be rejected as a whole; such opinions are still awarded considerable deference and must be weighed according to the appropriate factors. Id. Because these procedural requirements have not been met, remand is warranted, regardless of whether the record as a whole supports the ALJ's determination. See Rogers, 486 F.3d at 243; see also Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 546 (6th Cir. 2004) ("A court cannot excuse the denial of a mandatory procedural protection simply because . . . there is sufficient evidence in the record for the ALJ to discount the treating source's opinion . . . .").[7]

### B. The ALJ's RFC is Not Supported by Substantial Evidence

In assessing an RFC, social security regulations require the ALJ to consider both severe impairments and non-severe impairments. 20 C.F.R. § 404.1545(e); see also Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5; White v. Comm'r of Soc. Sec., 312 F. App'x 779, 787 (6th Cir.

---

[7] Notably, the Wilson court acknowledged that a procedural violation could potentially constitute harmless error if the violation was a de minimis one, or if the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it." Wilson, 378 F.3d at 547. However, the Wilson court expressly did not decide the question, id., and the Court, in light of Plaintiff's subjective allegations of pain, cannot say that Dr. Moore's medical opinion is patently deficient as a matter of law.

2009). Furthermore, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Soc. Sec. Rul. 96-8p, at *7.

Plaintiff argues that her impairments prevent her from engaging in light work, and that the medical evidence of record indicates that "she is unable to work at any exertional level as a result of her chronic orthopedic pain and [mental] health impairments." Pl. Mot. at 6-7. In support of her argument, Plaintiff, again, simply reiterates the recitation of her medical history from the background portion of her brief. See id. 8-9, 9-11; compare id. at 2-5.

In response, Defendant argues that the medical evidence does not demonstrate that Plaintiff is unable to perform work at the "light" exertional level. Def. Mot. at 7-8. Defendant further argues that Plaintiff's description of her daily activities also suggests that she would at least be able to perform light work. Id. at 9. Defendant similarly claims that Plaintiff fails to specify any additional limitations or restrictions from which she suffers, and that the medical evidence and her reported activities all undermine the assertion that Plaintiff's mental conditions are disabling. Id. at 11-13.

In light of the Court's finding that the ALJ's dismissal of Dr. Moore's medical opinion violated the treating-physician rule, thereby constituting a lack of substantial evidence, the Court concludes that the ALJ's RFC assessment similarly lacks substantial evidence. See Rogers, 486 F.3d at 249-250 (finding that, because the ALJ violated the procedural protections of the treating-physician rule, among other errors, the ALJ's RFC assessment, and its use at Step Four, were "similarly flawed"). Aside from Dr. Moore's recommendation that Plaintiff's condition precluded her from working altogether, Dr. Moore's opinion also identified limitations and restrictions from which Plaintiff suffered that were not included in the ALJ's RFC. See A.R. at

308-309 (noting that Plaintiff's ability to walk and/or stand was impaired; that Plaintiff's ability to lift was impaired; that Plaintiff had limitations in reaching and handling; and that Plaintiff required work with a sit/stand option). Although Dr. Moore's opinion may not have been entitled to controlling weight, it still must be given its due deference and, upon evaluating the factors, it is possible that additional limitations may further erode Plaintiff's ability to perform light work, or any work at all. Consequently, the Court concludes that the ALJ's RFC is not supported by substantial evidence, and remand is warranted.[8]

## VI. CONCLUSION

For the reasons stated above, the Court grants Plaintiff's motion for summary judgment (Dkt. 15), denies Defendant's motion for summary judgment (Dkt. 17), and remands the case to the Commissioner for further proceedings consistent with this opinion, pursuant to 42 U.S.C. § 405(g), sentence four.

SO ORDERED.


Dated: January 26, 2015　　　　　　　s/Mark A. Goldsmith
　　　　Detroit, Michigan　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　United States District Judge


### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 26, 2015.

　　　　　　　　　　　　　　　　　　　s/Johnetta M. Curry-Williams
　　　　　　　　　　　　　　　　　　　Case Manager

---

[8] For the same reason, the ALJ's hypothetical to the VE was flawed in that it reflected an RFC that failed to appropriately consider Dr. Moore's opinion.